**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted March 26, 2020[*]
Decided March 26, 2020

**Before**

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 18-1879

| | |
|---|---|
| LAWRENCE LARSEN, *Plaintiff-Appellant,* | Appeal from the United States District Court for the Northern District of Illinois, Western Division. |
| *v.* | No. 15 C 50309 |
| CARROLL COUNTY, et al., *Defendants-Appellees.* | Frederick J. Kapala, *Judge.* |

**O R D E R**

Lawrence Larsen called law enforcement to investigate a potential intruder in his home and wound up getting arrested for drug possession. He then filed this suit against the responding officers and their employers, alleging violations of the United States Constitution and Illinois law. The district court entered summary judgment in the defendants' favor, and we affirm.

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

Larsen and Belinda Nair lived together in Savanna, Illinois. One afternoon in late 2014, Larsen was home with their six-week-old son and two of Nair's young children. Larsen believed he heard a strange phone ring inside the home; concerned, he sent the children to a neighbor's house to call 911.

Two officers—one from the Savanna Police Department and another from the Carroll County Sheriff's Office—responded to the call. When the officers arrived, they searched the house for intruders (at Larsen's request) and found no one inside. The officers then questioned Larsen, who they suspected might be intoxicated. In their incident reports and later testimony, they described Larsen as "jittery" with dilated pupils, and noted that he was sweating, talking quickly, and acting paranoid. Larsen denied using drugs that day, though he later admitted to consuming at least half a gram of methamphetamine the night before. The officers asked about the children's mother, but Larsen refused to tell them her identity or how to reach her. Eventually, with a neighbor's help, the deputy sheriff contacted Nair at work.

On the phone, the deputy sheriff asked Nair if the officers could search for drugs. According to the deputy's written reports and deposition testimony, Nair consented to a search of the garage and the house. For her part, Nair testified (in a deposition two years later) that she agreed to a search of the garage. But in response to a question about whether the deputy had asked for her consent to search the house, she replied, "No. I don't, you know, remember anything being said about the home at all.… [W]hen he asked where … drugs [might] be located in my house and I told him the garage, he asked if he could look in there, and I said yes." Nair was then asked, "hypothetically," what she "would have said" if he had sought her consent to search the house. She responded, "Well, I have nothing to hide. So … I probably would have said yes with all that was going on.… My kids were my only concern at that moment."

The deputy sheriff relayed Nair's consent to the other officer and then searched the house. In a bedroom, he found a crumpled piece of paper with white powder residue on it, next to a broken pen and a mirror. A field test of the powder came back positive for methamphetamine. The tested sample was destroyed, but a separate sample was preserved as evidence. The officers arrested Larsen and took him to the county jail.

At the jail, Larsen began having seizures, so he was taken to the hospital. There, he tested positive for amphetamines and was diagnosed with methamphetamine overdose and methamphetamine-induced seizures. The treating physician described

Larsen as disoriented, violent, and hallucinating, and opined to a "reasonable degree of medical certainty" that Larsen had ingested methamphetamine that day. Three days later, state authorities charged Larsen with possession of methamphetamine, 720 ILCS 646/60(b)(1). The state later dismissed the charge based on insufficient evidence after testing of the preserved powder sample came back negative for methamphetamine.

Larsen and Nair sued the officers, Carroll County, and the City of Savanna, alleging that the second search of the house and Larsen's arrest violated the Fourth Amendment. They also brought state-law claims of malicious prosecution and intentional infliction of emotional distress. The district court entered summary judgment for the defendants, and Larsen and Nair appealed. We later dismissed the appeal as to Nair at her request. *See* FED. R. APP. P. 42(b).

Larsen's brief is only minimally developed, *see* FED. R. APP. P. 28(a)(8), but we will address the two principal arguments that we can discern. Larsen first contends that the search of the house for drugs violated his Fourth Amendment rights because Nair did not consent to a search of anything other than the garage. Although a warrantless search is presumptively unreasonable, a search conducted with the consent of an authorized person is permissible. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *Wonsey v. City of Chicago*, 940 F.3d 394, 399 (7th Cir. 2019). To show that consent was lacking, Larsen relies solely on Nair's deposition testimony in response to the question of whether any officer had asked for her consent to search the house: "No. I don't, you know, remember anything being said about the home at all." Larsen asserts, without support, that "Nair's memory is intact" and argues that her inability to recall being asked for consent to search the house means that she in fact was *not* asked for it.

Even viewing the record in the light most favorable to Larsen, as we must, Nair's testimony establishes only that she could not remember whether an officer had asked for her consent to search the home. And a lack of recollection does not, by itself, create a genuine dispute of material fact. *See Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011) (plaintiff's testimony that he "could not recall" whether event occurred was "inconclusive" and so "cannot by itself create a genuine factual dispute"); *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735–36 (7th Cir. 2002) (plaintiff's assertion that she did not remember receiving brochure did not raise genuine factual issue as to whether it was distributed to her). The deputy sheriff stated in his written report at the time and testified in his later deposition that Nair consented to a search of the house and the garage to rid them of any drugs. And the record contains no sworn testimony that Nair

refused consent—in fact, she testified that, had she been asked, she "probably would have said yes" to a search of the home.

Larsen further argues that, at the very least, Nair's equivocal response "should have been clarified." But the onus was on Larsen to do so. In response to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (quoting *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010)). Specifically, when presented with admissible evidence that consent was given, Larsen had the burden to produce evidence that officers "never obtained consent or the consent was invalid." *Wonsey*, 940 F.3d at 399. Larsen was represented by counsel in the district court and could have clarified Nair's testimony. *See Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1103 (7th Cir. 2019) ("[A] party may offer an affidavit in response to a summary-judgment motion 'to clarify ambiguous or confusing testimony,'" including when "earlier testimony was 'the result of a memory lapse.'" (citation omitted)). Yet he did not, and he points to no other evidence to support his argument.

Even if Larsen had met his burden in this regard, he still would not prevail. His brief does not even mention the district court's alternate ruling—that the officers are entitled to qualified immunity for the second search of the house—thus abandoning any challenge to that decision. *See Campos v. Cook Cnty.*, 932 F.3d 972, 976 (7th Cir. 2019); *Anderson v. Hardman*, 241 F.3d 544, 545–46 (7th Cir. 2001).

Larsen also challenges the entry of summary judgment for the defendants on his claims for wrongful arrest and malicious prosecution. His entire argument turns on the eventual dismissal of the drug-possession charge against him. This dismissal, he contends, proves that the officers "fabricated" the evidence in order to "trump up charges" against him.

Not so. The end result of the state criminal proceeding has scant bearing on the propriety of the warrantless arrest, which is constitutional so long as the arresting officer had probable cause that a crime had been or was being committed. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Similarly, a plaintiff pursuing a malicious-prosecution claim in Illinois must establish more than just termination of the criminal proceedings in his favor. He also must prove, among other factors, "the absence of probable cause for such proceeding." *Beaman v. Freesmeyer*, 131 N.E.3d 488, 495 (Ill. 2019). But here, Larsen does not challenge the conclusion that the officers had probable cause to arrest him for

possession of methamphetamine, and the record (which includes evidence of Larsen's obvious intoxication and the positive field test) supports probable cause. *See Devenpeck*, 543 U.S. at 152 ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."). Nor does he contend that state prosecutors lacked probable cause to charge him with that crime. (In fact, Larsen waived a probable-cause hearing in state court.) The existence of probable cause is an absolute bar to a claim of false arrest under the Fourth Amendment, *see Dollard v. Whisenand*, 946 F.3d 342, 353 (7th Cir. 2019), and to a claim of malicious prosecution under Illinois law, *see Beaman*, 131 N.E.3d at 495. So the district court properly granted defendants summary judgment on these claims.

AFFIRMED